**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| PROJECT VERTE INC., | ) | Case No. 23-0101-LSS |
| | ) | |
| Debtor. | ) | Adv. Proc. No. 23-50459-LSS |
| | ) | |
| ALFRED T. GIULIANO, as Trustee for Project Verte Inc., | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| JULIAN KAHLON and GRAHAM FORTGANG, | ) | |
| | ) | |
| Defendants. | ) | |

**OPENING BRIEF OF DEFENDANTS JULIAN KAHLON AND GRAHAM FORTGANG**
**IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT**

OF COUNSEL:

Leonard Weintraub
(admitted *pro hac vice*)
Noah Bunzl (admitted *pro hac vice*)
Paduano & Weintraub LLP
1251 Avenue of the Americas, 9th Floor
New York, NY 10020
(212) 785-9100
lw@pwlawyers.com
nhb@pwlawyers.com

Dated: November 30, 2023

Evan O. Williford (No. 4162)
The Williford Firm LLC
1007 N. Orange Street
Suite 235
Wilmington, DE  19801
(302) 654-5924
evanwilliford@thewillifordfirm.com

*Attorneys for Defendants*
*Julian Kahlon and Graham Fortgang*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... iii

STATEMENT OF NATURE AND STAGE OF PROCEEDING ................................................. 1

THE TRUSTEE'S ALLEGATIONS ............................................................................................ 3

      Project Verte Was Insolvent ............................................................................................. 3

      Kahlon's Prior Role at the Company and the <u>Kahlon</u> Litigation ....................................... 4

      The Prior Board Authorizes the Decision to Market the Fulfillment Business ................. 4

      The Company Struggles to Sell the Fulfillment Business ................................................. 6

      The Trustee's Breach of Fiduciary Duty Claim ............................................................... 9

SUMMARY OF ARGUMENT .................................................................................................... 9

ARGUMENT .............................................................................................................................. 10

I.      LEGAL STANDARD FOR A MOTION TO DISMISS ............................................. 10

II.     THE COMPANY WAS INSOLVENT AT THE TIME OF THE
        EVENTS IN QUESTION ............................................................................................. 11

III.    DIRECTORS OF INSOLVENT CORPORATIONS OWE DUTIES TO
        CREDITORS AS WELL AS TO SHAREHOLDERS AND MAY DETERMINE
        THAT IT IS IN THE BEST INTERESTS OF THE CORPORATION NOT TO
        CONTINUE AS A GOING CONCERN ..................................................................... 13

IV.    DELAWARE'S BUSINESS JUDGMENT RULE PROTECTS DIRECTORS,
        SUCH AS DEFENDANTS, FROM BEING SUED FOR ALLEGEDLY
        BAD DECISIONS ....................................................................................................... 17

V.     THE AMENDED COMPLAINT DOES NOT SUFFICIENTLY PLEAD A
        BREACH OF FIDUCIARY DUTY ........................................................................... 18

      A.  The Amended Complaint Does Not Sufficiently Plead a Breach of the
           Duty of Care .......................................................................................................... 18

      B.  The Amended Complaint Does Not Sufficiently Plead a Breach of the
           Duty of Loyalty ..................................................................................................... 20

            1.   The Specific Allegations Solely Against Defendant Kahlon .................... 22

2.   The Specific Allegations Solely Against Defendant Fortgang ..................23

VI.    THE COMPANY'S CERTIFICATE OF INCORPORATION INSULATES
DEFENDANTS, AS DIRECTORS, FROM LIABILITY FOR BREACH
OF FIDUCIARY DUTY..............................................................................................25

VII.    THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH
PREJUDICE, WITHOUT LEAVE TO REPLEAD .....................................................26

CONCLUSION...................................................................................................................27

## TABLE OF AUTHORITIES

Cases                                                                                          Page(s)

AmerisouceBergen Corp. v. Leb. Cty. Employees' Ret. Fund,
243 A.3d 417 (Del. 2020) ...............................................................................................26

Baraka v. McGreevey,
481 F.3d 187 (3d Cir. 2007).............................................................................................11

Barsa v. Theseus Strategy Grp., LLC (In re Old BPSUSH, Inc.),
Adv. Pro. No. 19-50726 (BLS), 2020 Bankr. LEXIS 1697
(Bankr. D. Del. June 30, 2020) ................................................................................ 14, 19-20

Beam v. Stewart,
845 A.D. 1040 (D. Del. 2004) .........................................................................................24

Bell Atlantic v. Twombly,
550 U.S. 544 (2007).........................................................................................................10

Bond v. Rosen (In re NSC Wholesale Holdings LLC),
637 B.R. 71 (Bankr. D. Del. 2022) ..................................................................................11

Brehm v. Eisner,
746 A.2d 244 (Del. 2000) ................................................................................................17

Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.),
388 B.R. 548 (Bankr. D. Del. 2008) ............................................................................ 18-19

Burtch v. Opus LLC (In re Opus E. LLC),
698 Fed. Appx. 711 (3d Cir. 2017)............................................................................. 11-12

Continuing Creditors' Comm. of Star Telecomms. Inc. v. Edgecomb,
385 F. Supp. 2d 449 (D. Del. 2004)..................................................................................18

Credit Lyonnais Bank Nederland, N.V. v. Pathe Communs. Corp.,
No. 12150, 1991 Del. Ch. LEXIS 215 (Del. Ch. 1991)...................................................14

Davis v. Neal,
No. 1:21-cv-01773-TLA, 2023 U.S. Dist. LEXIS 144106
(D. Del. Aug. 17, 2023) ...................................................................................................26

Doe v. Princeton Univ.,
30 F. 4th 335 (3d Cir. 2022) ............................................................................................5n

F5 Capital v. Pappas,
No. Civ. 9356 (AT), 2016 U.S. Dist. LEXIS 30500 (S.D.N.Y. Feb. 17, 2016) ............18

Firemen's Ret. Sys. of St. Louis v. Sorenson,
No. 2019-0965-LWW, 2021 Del. Ch. LEXIS 234 (Del. Ch. Oct. 5, 2021) ................................26

Frederick Hsu Living Trust v. ODN Holding Corp.,
No. 12108-VCL, 2017 Del. Ch. LEXIS 67 (Del. Ch. 2017) .........................................................14

Gavin v. Tousignant (In re Ultimate Escapes Holdings, LLC),
551 B.R. 749 (D. Del. Feb. 23, 2016)...........................................................................................22

In re Answers Corp. S'holders Litig.,
No. 6170-VCN, 2012 Del. Ch. LEXIS 76 (Del. Ch. Apr. 11, 2012)..................................25, 25n

In re Citigroup Inc. Shareholder Derivative Litig.,
964 A.2d 106 (Del. Ch. 2009)........................................................................................................17

In re EBC I, Inc.,
380 B.R. 348 (Bankr. D. Del. 2008) ..............................................................................................12

In re March Group,
No. 2020-0505-MTZ, 2022 Del. Ch. LEXIS 499 (Del. Ch. Sep. 1, 2022).............................. 24-25

In re McDonald's Corp. Shareholder Derivative Litig.,
291 A.3d 652 (Del. Ch. 2023)........................................................................................................17

In re Novell, Inc. S'holder Litig.,
No. 6032-VCN, 2014 Del. Ch. LEXIS 249 (Del. Ch. Nov. 25, 2014) ..........................................20

In re Orbit/FR Stockholders Litig.,
No. 2018-0340-SG, 2023 Del. Ch. LEXIS 19 (Del. Ch. Jan. 24, 2023)......................................25n

In re PLX Tech. Stockholders Litig.,
No. 9880-VCL, 2018 Del. Ch. LEXIS 336 (Del. Ch. Oct. 16, 2018)............................................23

In re Teleglobe Commc'ns Corp.,
392 B.R. 561 (Bankr. D. Del. 2008) ..............................................................................................12

In re TIBCO Software Inc. Stockholders Litig.,
No. 10319-CB, 2015 Del. Ch. LEXIS 265 (Del. Ch. Oct. 20, 2015) ...........................................21n

In re Trans World Airlines, Inc.,
134 F.3d 188 (3d Cir. 1998)...........................................................................................................11

Liquidation Trust of Solutions Liquidation LLC v.
Stienes (In re Solutions Liquidation LLC),
608 B.R. 384 (Bankr. D. Del. 2019) ..............................................................................................19

McElrath v. Kalanick,
224 A.3d 982 (Del. 2020) ...........................................................................26

McPadden v. Sidhu,
964 A.2d 1262 (Del. Ch. 2008).....................................................................20

MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.,
910 F. Supp. 913 (S.D.N.Y. 1995).................................................................12

MKE Holdings, Ltd. v. Schwartz,
No. 20-2018-0729-SG, 2019 Del. Ch. LEXIS 1285 (Del. Ch. June 27, 2019) ............................23

Moody v. Sec. Pac. Bus. Credit, Inc.,
971 F.2d 1056 (3d Cir. 1992)........................................................................11

N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,
930 A.2d 92 (Del. 2007) .............................................................................13

Oatway v. Am. Int'l Group, Inc.,
325 F.3d 184 (3d Cir. 2003).........................................................................10

Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v.
Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.),
405 B.R. 527 (Bankr. D. Del. 2009) ..........................................................20-21

Peltz v. Hatten,
279 B.R. 710 (D. Del. 2002) ........................................................................12

Phillips v. Cty. of Allegheny,
515 F.3d 224 (3d Cir. 2008).........................................................................26

Prod. Res. Group, L.L.C. v. NCT Group, Inc.,
863 A.2d 772 (Del. Ch. 2004).......................................................................13

Quadrant Structured Prods. Co, LTD v. Vertin,
115 A.3d 535 (Del. Ch. 2015).......................................................................13

RSH Liquidating Trust v. Magnacca,
553 B.R. 298 (Bankr. N.D. Tex. June 8, 2016) ..............................................21n, 22

Sands v. McCormick,
502 F.3d 263 (3d Cir. 2007)..........................................................................11

Stone v. Ritter,
911 A.2d 362 (Del. 2006) ............................................................................20

Torch Liquidating Trust v. Stockstill,
No. 07-133 Section T(1), 2008 U.S. Dist. LEXIS 19535
(E.D. La. Mar. 13, 2008), affirmed 561 F.3d 377 (5th Cir. 2009).......................................... 17-18

Tvi Corp. v. Gallagher,
No. 7798-VCP, 2013 Del. Ch. LEXIS 260 (Del. Ch. Oct. 28, 2013).........................................25n

Wyeth, Cardinal Health, Inc. v. Ranbaxy Labs., Ltd.,
448 F. Supp. 2d 607 (D.N.J. 2006) ............................................................................................11

Statutes

11 U.S.C. § 548(a)(1)(B)(ii)(II) ................................................................................................12

Rules

Fed. R. Civ. Pr. 12(b)(6) .............................................................................................................1

Fed. R. Bankr. Pr. 7012................................................................................................................1

Defendants Julian Kahlon ("Kahlon") and Graham Fortgang ("Fortgang") (collectively, "Defendants") submit this memorandum of law in support of their motion to dismiss (the "Motion to Dismiss") the First Amended Complaint, dated November 1, 2023 [D.E. 29] (the "Amended Complaint" or "FAC") filed by Chapter 7 Trustee Alfred T. Giuliano (the "Trustee") on behalf of Project Verte Inc. ("Project Verte" or the "Company"), pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) and Federal Rule of Bankruptcy Procedure ("Bankr. Rule") 7012. The Trustee's initial Complaint was filed on August 11, 2023 [D.E. 1] (the "Complaint") and Defendants' motion to dismiss the Complaint was filed on October 11, 2023. See D.E. 17-18. For the reasons set forth below, the Amended Complaint should be dismissed with prejudice in its entirety for failure to state a claim for which relief can be granted. Defendants do not consent to the entry of a final order or judgment by this Court pursuant to Bankr. Rule 7012(b).[1]

## STATEMENT OF NATURE AND STAGE OF PROCEEDING

Project Verte was a struggling company with only two assets: an e-commerce warehouse in Atlanta (the "Fulfillment Business") and proprietary warehouse technology (the "Technology Assets"). At the time that Defendants joined the Company's board of directors (the "Board") in April 2022 as two of four directors, the Company – which had never turned a profit – was insolvent, with more than $115 million in debt and losing millions of dollars per month.

Prior to Defendants joining the Board, management proposed selling the Fulfillment Business. Following the sale, the Company would be left with Technology Assets with limited value and would still be over $100 million in debt. Over the course of several Board meetings from May through July 2022, Defendants questioned and ultimately opposed the sale,

---

[1]     Submitted herewith in support of the Motion to Dismiss is the Declaration of Leonard Weintraub, dated November 30, 2023 (the "Weintraub Declaration").

voting "no" and then not agreeing to change their vote in the face of pressure from management. It is clear from the face of the Amended Complaint that Defendants had material concerns about the proposed sale, including the low price and the lack of a plan for the future of the Company, including what would be done with the Technology Assets, if anything.  In August 2022 the Company went into receivership and then declared bankruptcy in January 2023.  Ultimately, the Technology Assets were sold by the receiver for $1.15 million.

At essence, the Amended Complaint alleges that the Defendants were presented with a binary choice:  either sell the Fulfillment Business or proceed to bankruptcy.  Because they did not vote in favor of selling the Fulfillment Business, the Trustee alleges that Defendants violated their fiduciary duties to the Company.  The Trustee's claims are illogical and contrary to the facts presented in the pleadings; and the Trustee fails to state any claim as a matter of law.

The Amended Complaint presents bankruptcy as an "impossible" option that should not have been considered under any circumstances.  In fact, directors of insolvent corporations (like Project Verte) owe duties to creditors (as well as to shareholders) and are permitted to decide not to continue an insolvent business as a going concern.  Accordingly, Defendants were permitted to "choose" liquidation and management did not seriously consider this option or present it as a viable option to the Board.  Accordingly, the Amended Complaint presents a false dichotomy with only one viable path forward (*i.e.*, the sale of the Fulfillment Business).

The Amended Complaint makes self-serving and conclusory allegations that Defendants were self-interested and concerned about things other than the best interests of the Company when they refused to vote in favor of the sale of the Fulfillment Business.  Indeed, in the Amended Complaint, the Trustee suggests for the first time that Defendant Kahlon was

motivated by "revenge and self-interest" because in 2020 he was terminated as the Company's CEO by the Board allegedly for cause for failing to follow the Board's directives to sign convertible notes that had been approved by the Board, which resulted in him filing a lawsuit against the Company for breach of his employment agreement in the United States District Court for the Southern District of New York.  Yet such allegations make no sense, because Kahlon's interests – as a significant investor in the Company and as a potential beneficiary of the lawsuit – were aligned with the Company.  Kahlon would only benefit from the success (and survival) of the Company.

Accordingly, the Amended Complaint clearly fails to state a cause of action for breach of fiduciary duty and should be dismissed.

## THE TRUSTEE'S ALLEGATIONS[2]

Project Verte Was Insolvent

There is no dispute that at all relevant times, the Company was insolvent.  In 2019, the Company lost $24.5 million.  FAC ¶ 27.  In 2020, the Company lost $27.6 million.  Id. ¶ 29. In 2021, the Company lost $23 million.  Id. ¶ 30.  The Company's revenue was only $78,790 in 2019, $1 million in 2020, and $5 million in 2021.  Id. ¶¶ 27-29.  By February 2022, the Company was losing $2.4 million *a month*.  Id. ¶ 38.  As of the summer 2022, the Company "had total liabilities of over $115 million."  Id. ¶ 109.  Indeed, the Amended Complaint admits that the Company could not evaluate the Fulfillment Business on an Earnings Before Interest, Taxes, Depreciation and Amortization basis – the typical method used to value for sale of an ongoing business – because "Project Verte was operating cashflow-negative."  Id. ¶ 72.

---

[2]      Defendants assume the facts alleged in the Amended Complaint, Weintraub Declaration, Exhibit A, to be true solely for purposes of this Motion to Dismiss.  Nothing contained herein is intended to be an admission that any alleged fact is true.

3

Moreover, even if the Fulfillment Business had been sold for $6 million – the proposal alleged in the Amended Complaint – the Company still would have been insolvent. The Company would have had in excess of $100 million in debt, and its only remaining asset – the Technology Assets – ultimately was sold for $1.15 million.   Accordingly, as a matter of law, the Company was insolvent, and whether it would have been "better" to sell the Fulfillment Business prior to the receivership or bankruptcy filing is a judgment call that cannot now be second guessed.

<u>Kahlon's Prior Role at the Company and the Kahlon Litigation</u>

According to the Amended Complaint, Kahlon is CEO of TNJ Holdings, Inc. ("<u>TNJ</u>"), an initial investor and shareholder in the Company. <u>FAC</u> ¶ 9.[3] Kahlon previously served as a director of the Company from July 2019 to January 2020 and was CEO of the Company from September 2018 to March 2020. <u>Id</u>. ¶ 19. In May 2020, Kahlon sued the Company "over a dispute regarding his employment agreement" in the matter captioned <u>Kahlon v. Project Verte, Inc.</u>, No. 20-cv-3774 (S.D.N.Y.) (the "<u>Kahlon Litigation</u>") and the Company filed a counterclaim. <u>See id</u>. ¶¶ 8, 53. In early 2022, the District Court granted and denied in part the parties' summary judgment motions (the "SJ Order"). <u>Id</u>. As set forth below, Defendant Kahlon rejoined the Board, along with Defendant Fortgang, in April 2022. <u>See id</u>. ¶¶ 45-47.

<u>The Prior Board Authorizes the Decision to Market the Fulfillment Business</u>

At a Board meeting on March 2, 2022, before Defendants joined the Board, "senior management recommended marketing the fulfillment business for sale as soon as possible." <u>Id</u>. ¶ 40. At a Board meeting on March 9, 2022, "[s]enior leadership [ ] presented a plan to market and sell the fulfillment business[.]" <u>Id</u>. ¶ 41. On March 10, 2022, the Board "voted to market and sell

---

[3]     As of April 2022, Kahlon was not CEO of TNJ. Rather, the position was held by a member of Kahlon's family.

the fulfillment business as soon as possible." Id.

On March 22, 2022, Board member Shelly Boniel resigned from the Board and was replaced by her son, Adam Boniel, who resigned two days later. Id. ¶¶ 43-44. On April 1, 2022, Defendant Kahlon was appointed to the Board as a representative of TNJ to replace the seat left vacant by the departure of Shelly and Adam Boniel. See id. ¶ 45. On April 7, 2022, Defendant Fortgang, also a representative of TNJ, was appointed to the Board to replace the seat left vacant by Rea Mihaic. Id. ¶ 47. The Trustee alleges that Kahlon, through TNJ, appointed Fortgang, who was a "friend" and "colleague on other business ventures and the principal of an LLC with an address in the same building where Defendant Kahlon lived." Id. ¶¶ 10-11, 49.

As characterized by the Trustee, in the SJ Order, "[t]he Court found neither party was entitled to summary judgment on their crossclaims asserting breach of an employment agreement, but granted Project Verte's motion for summary judgement on all other claims asserted by Defendant Kahlon" and "[f]resh off his motion's denial and the loss of all his claims against the Company except one, Kahlon decided to appoint himself and his friend to the Board." Id. ¶¶ 53-54 [4]. The Trustee's suggestion that the SJ Order completely separated Kahlon's interests from those of the Company is illogical. In fact, the SJ Order made clear that Kahlon had a viable claim against the Company and would therefore have an interest in the Company's success generally.

---

[4]     The SJ Order is attached to the Weintraub Declaration as Exhibit B. See Doe v. Princeton Univ., 30 F. 4th 335, 342 (3d Cir. 2022) (the court may take judicial notice of documents that are "integral to or explicitly relied upon in the complaint") (internal citations and quotation marks omitted). The Trustee's presentation of the SJ Order is at best confusing. As set forth in the SJ Order, the Company moved for summary judgment on all of Kahlon's claims against the Company (for breach of the employment agreement and related claims) and Kahlon moved for summary judgment on the Company's counterclaim for breach of the employment agreement. The Court granted in part and denied in part the Company's motion (permitting Kahlon's claim for breach of the employment agreement to survive) and denied Kahlon's motion to dismiss the counterclaim. Accordingly, the Court allowed both side's claims for breach of the employment agreement to proceed to trial.

The Company Struggles to Sell the Fulfillment Business

The new Board (including Defendants) met for the first time on May 2, 2022.  Id. ¶ 57.  The Company informed the Board that management had engaged Jim Tompkins and Tompkins Ventures (collectively, "Tompkins") to market the Fulfillment Business.  Id. ¶¶ 58-59.  Although management had reached out to other advisors, "[a]ll [other] prospective professionals declined the engagement because Project Verte was operating at a loss[.]"  Id. ¶ 61.

Despite aggressive marketing by Tompkins and the Company, the Company received only a few responses indicating any interest in the Fulfillment Business.  Id. ¶¶ 69-70.

The Board next met on June 29, 2022.  Id. ¶ 73.  At this meeting, the Board was informed that the Company had received two offers for the Fulfillment Business.  Id. ¶ 81.  One offer is presented in the Complaint as being unsuitable and having "deal killer" conditions, including a requirement for new customer contracts before closing.  Id. ¶ 82.  The second – which is presented by the Amended Complaint as more suitable – was a $4.65 million offer from GPA Logistics ("GPA").  Id. ¶ 83.

The Board was not presented with any other sale options and was told by management that GPA's offer was the "'overwhelming favorite" even if other offers might still be made, given the "Company burn rate."  Id. ¶¶ 87-95.  At the meeting, Defendant Fortgang asked for more information about how the offer aligned with the Company's expectations and asked for a copy of the offering memorandum.  Id. ¶¶ 96-98.  Stephen Bullard, the Company's Executive Vice President of Operations, identified another potential buyer but commented that "he did not think that they had financing in place to make a cash offer within the Company's timeline."  Id. ¶¶ 67, 93.

The Board met again on July 18, 2022. Id. ¶ 100. It was notified that GPA's offer had increased to $6 million. Id. ¶¶ 104-110. During this meeting, Defendants expressed concerns about management's strategy. Fortgang pointed out that GPA's "'offer is not enough to cover the liabilities'" and asked if other sales professionals could be consulted. Id. ¶ 111. In response, Fortgang was told that Tompkins had been hired on an exclusive basis and that other buyers had turned the Company down "because it was not an EBITDA sale" and the buyer would require "$10-15 million additional capital to make [the business] viable." Id. ¶¶ 114-17.

Fortgang also asked "'how anyone could make a decision on the sale of the fulfillment business without a model or clarity from [management] as to what the future of the technology business will look like.'" Id. ¶ 123. Fortgang "suggested they 'wait and understand what will happen with the technology business before the sale of the fulfillment business.'" Id. ¶ 124. Kahlon agreed and "said he wanted to know what was next for the Company in order to decide on the sale of the fulfillment business." Id. ¶ 125.

In response, Defendants were told there was no funding to make a "future business plan" for the Technology Assets absent the sale of the Fulfillment Business and the Company "had two choices: sell the Fulfillment Business or cease operations." Id. ¶ 126-28. Defendants and the other Board members were advised by outside counsel that it was costing more than $50,000 per day to keep the Company operational and if nothing was done immediately the Company faced bankruptcy. Id. ¶ 130. Outside counsel made clear that the Company could not survive for several weeks longer without selling the Fulfillment Business. Id. ¶ 131.

Fortgang "responded again that he wanted a clear plan for the technology business going forward and later said they should take more time to decide"; he "reiterated that the future of the technology business was important to decide whether to sell the fulfillment business[.]" Id.

¶¶ 137-38.  No vote was held at this meeting.  Id. ¶ 139.

The Board met again two days later, on July 20, 2022.  Id. ¶ 144.  Outside counsel told the Defendants that "if they did not approve the sale, that was basically a decision to stop doing business."  Id. ¶ 145.  Fortgang confirmed that his vote was a "firm 'no'" and stated that "no one should be asked to reconsider."  Id. ¶ 156.  Kahlon also voted against the sale; the other two directors voted for the sale.  Id. ¶¶ 159-62.

At that Board meeting, there were still three open issues concerning the GPA offer: "(i) how much the broker would get in a commission fee, (ii) whether GPA would use [Project Verte's] technology (not a deal-killer as Ms. Gol just explained), and (iii) what percentage of cash would be paid at closing – 90% or 100%."  Id. ¶ 153.  Thus, the Amended Complaint admits that the GPA "offer" was never even finalized.

The Board met again six days later on July 26, 2022.  Id. ¶¶ 165-69.  No new information was provided at this meeting.  Id.  As a result of no new information being provided at this meeting, Kahlon confirmed that he was not going to change his vote.  Id. ¶¶ 170-72.  Similarly, Fortgang agreed that he was still a "no" and indicated that "nothing would change their minds."  Id. ¶ 173.

On July 30, 2022, Fortgang resigned from the Board.  Id. ¶ 184.  The Trustee does not explain in the Amended Complaint why the Board did not reconvene at that time – four days after its July 26, 2022 meeting – and approve the sale, if a majority of the Board (after Fortgang's resignation) was in favor of such sale.  Similarly, the Trustee does not explain in the Amended Complaint why Jane Gol – the Company's President and its controlling shareholder (who directly and indirectly owned and/or controlled two-thirds of the Company's shares) – did not call a special shareholder's meeting and simply approve the sale despite the lack of Board approval.

On August 25, 2022, a receiver (the "Receiver") was appointed for the Company. Id. ¶ 191.  The Company did not subsequently sell the Fulfillment Business to GPA and the Company filed for bankruptcy on January 26, 2023.  See id. ¶¶ 195-96.[5]

The Trustee's Breach of Fiduciary Duty Claim

The Amended Complaint asserts a single claim against Defendants – that they breached their fiduciary duties to the Company.  Id. ¶¶ 198-206.  The Trustee alleges that "Defendants each breached their duties of loyalty to Project Verte by using their position of control to advance their personal interests rather than the Company's best interests" and that "motivated by revenge, self-interest, and concerns other than Project Verte's best interests, each intentionally acted with a purpose other than that of advancing the best interests of Project Verte by refusing to approve the sale of the fulfillment business, demonstrating bad faith and a breach of the fiduciary duties of good faith and loyalty they each owed Project Verte."  Id. ¶¶ 201-202.

## SUMMARY OF ARGUMENT

1.    The Amended Complaint fails to state a cause of action for breach of fiduciary duty because the Company was insolvent at all relevant times, and Defendants, as directors, owed a primary duty to creditors.  Letting an insolvent company file for receivership or bankruptcy, instead of selling the Company's primary asset purportedly for $6 million, when the Company owed in excess of $115 million, and its only other asset was sold for approximately $1 million, cannot, as a matter of law, constitute a breach of a director's fiduciary duty.

---

[5]    The Amended Complaint does not address the value of the Technology Assets or the ultimate disposition of the Technology Assets.  However, the docket in the main bankruptcy action (Case No. 23-10101-LSS) (D.E. 30) reveals that the Receiver sold the Technology Assets for approximately $1,150,000.  See Weintraub Declaration, Exhibit D (sub-exhibits omitted).

2.      The Trustee's admission that GPA's purported "offer" of $6 million for the Fulfillment Business was never finalized is fatal to his claim, because any purported damages would be speculative.

3.      The Trustee's claim for breach of fiduciary duty is barred by Delaware's business judgment rule.

4.      The Amended Complaint fails to state a cause of action for breach of fiduciary duty of care because the Trustee has not sufficiently pled that Defendants acted with gross negligence.

5.      The Amended Complaint fails to state a cause of action for breach of fiduciary duty because there are no non-conclusory allegations that Defendants were self-interested or had any material conflict of interest.

6.      The Amended Complaint's claim for breach of fiduciary duty of care is barred because the Company's Certificate of Incorporation (of which the Court can take judicial notice on a motion to dismiss) contains a clause exculpating directors from monetary damages for breach of fiduciary duty.

## ARGUMENT

### I.    LEGAL STANDARD FOR A MOTION TO DISMISS

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain sufficient factual allegations, which, if true, would establish plausible grounds for a claim. See Bell Atlantic v. Twombly, 550 U.S. 544, 557 (2007). In deciding a motion to dismiss under Rule 12(b)(6), a court evaluates whether a plaintiff is "entitled to offer evidence to support the claims," and "not whether a plaintiff will ultimately prevail." Oatway v. Am. Int'l Group, Inc., 325 F.3d 184, 187 (3d Cir. 2003). In considering a motion to dismiss under Rule 12(b)(6), the allegations in the complaint are accepted as true and the complaint is construed "in the light most

favorable to the plaintiff" to "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Sands v. McCormick, 502 F.3d 263, 267-68 (3d Cir. 2007).

However, "a court need not credit a plaintiff's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." Id.; see also Bond v. Rosen (In re NSC Wholesale Holdings LLC), 637 B.R. 71, 80 (Bankr. D. Del. 2022) (same); Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007) ("The Court need not accept 'unsupported conclusions and unwarranted inferences'") (citation omitted); Wyeth, Cardinal Health, Inc. v. Ranbaxy Labs., Ltd., 448 F. Supp. 2d 607, 609 (D.N.J. 2006) ("[l]egal conclusions made in the guise of factual allegations . . . are given no presumption of truthfulness").

## II.   THE COMPANY WAS INSOLVENT AT THE TIME OF THE EVENTS IN QUESTION

"There are three tests for determining whether an organization is insolvent at a given point in time:  the balance sheet test, the cash flow test, and the inadequate capital test." Burtch v. Opus LLC (In re Opus E. LLC), 698 Fed. Appx. 711, 715 (3d Cir. 2017).  "Under the balance sheet test, a debtor is insolvent if the sum of its liabilities is greater than the sum of its assets, at fair valuation." Id.  "'Fair valuation' is determined by valuing the debtor's assets on either a going concern or liquidation basis; the latter is only appropriate where bankruptcy is 'clearly imminent' and the "business is on its deathbed."" Id. (citing Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1067 (3d Cir. 1992)).  Going concern value is determined by looking at an asset's "market value," analyzed in a "realistic framework" that accounts for the "amounts [of cash] that can be realized in a reasonable time assuming a willing seller and a willing buyer." In re Trans World Airlines, Inc., 134 F.3d 188, 193-94 (3d Cir. 1998).

"A debtor is cash flow insolvent if, at the time a transfer is made, the debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond

11

its ability to pay as they came due." Burtch, 698 Fed. Appx. at 715; see In re Teleglobe Commc'ns Corp., 392 B.R. 561, 602-03 (Bankr. D. Del. 2008) (this is a "forward looking" test that requires assessing the debtor's reasonable prediction about its ability to repay a debt as it is incurred). A court may take into account whether the debtor was "able to pay, intended to pay, and . . . was paying its debts as they came due." In re EBC I, Inc., 380 B.R. 348, 359 (Bankr. D. Del. 2008).

"Under the inadequate capital or unreasonably small capital test, a debtor is insolvent if it 'was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.'" Burtch, 698 Fed. Appx. at 715 (citing 11 U.S.C. § 548(a)(1)(B)(ii)(II)). An entity has unreasonably small capital if it lacks the ability to generate sufficient profits to sustain operations. Peltz v. Hatten, 279 B.R. 710, 744-45 (D. Del. 2002). In other words, insolvency occurs after a transfer "that leave[s] the debtor technically solvent but doomed to fail." MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 944 (S.D.N.Y. 1995).

Project Verte was clearly insolvent at all relevant times, including as of the time that the Board first authorized the marketing of the Fulfillment Business in March 2022 and thereafter. With respect to the balance sheet test, the Company's liabilities were clearly greater than the sum of its assets (either on a going concern or liquidation basis). According to the Amended Complaint, the Company had approximately $115 million in debt and the Company was only able to obtain $6 million for the Fulfillment Business in the context of an arm's length sale. Furthermore, the Receiver ultimately sold the Technology Assets for $1.15 million.

The Company was also cash flow insolvent because it had $115 million in debt and was losing over $2.4 million per month. The Company had no apparent way to pay these debts. Accordingly, the Company did not have the ability to pay its debts as they came due.

Finally, the Company was also insolvent pursuant to the inadequate capital test. The Company was prepared to sell its primary asset, the Fulfillment Business, which would leave it with unproven Technology Assets (which ultimately sold for $1.15 million), and the Company would still be facing over $100 million in debt.

### III.    DIRECTORS OF INSOLVENT CORPORATIONS OWE DUTIES TO CREDITORS AS WELL AS TO SHAREHOLDERS AND MAY DETERMINE THAT IT IS IN THE BEST INTERESTS OF THE CORPORATION NOT TO CONTINUE AS A GOING CONCERN

The Delaware Supreme Court has confirmed that when a company becomes insolvent, creditors become the primary focus of the director's fiduciary duties.  See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 101-02 (Del. 2007) ("directors owe fiduciary duties to the corporation. . . . [w]hen a corporation is *insolvent*, [ ] its creditors take the place of the shareholders as the residual beneficiaries of any increase in value. . . . [the] insolvency 'makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value'") (citations omitted).

When a company is insolvent, directors may determine that it would not be in the corporation's best interests to continue as a going concern.  See Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 790-91 n.60 (Del. Ch. 2004) ("The maximization of the economic value of the firm might, in circumstances of insolvency, require the directors to undertake the course of action that best preserves value in a situation when the procession of the firm as a going concern would be value-destroying.  In other words, the efficient liquidation of an insolvent firm might well be the method by which the firm's value is enhanced in order to meet the legitimate claims of its creditors.") (modified on other grounds by Gheewalla, 930 A.2d at 102-03); accord Quadrant Structured Prods. Co, LTD v. Vertin, 115 A.3d 535, 546-47 (Del. Ch. 2015) ("The directors of an insolvent corporation . . . continue to owe fiduciary duties to the corporation for the

benefit of all of its residual claimants, a category which now includes creditors.  They do not have

a duty to shut down the insolvent firm and marshal its assets for distribution to creditors, *although*

*they may make a business judgment that this is indeed the best route to maximize the firm's value*.")

(emphasis added); <u>Frederick Hsu Living Trust v. ODN Holding Corp.</u>, No. 12108-VCL, 2017 Del.

Ch. LEXIS 67, at *48-49 (Del. Ch. Apr. 14, 2017) ("a duty to maximize long-term value does not

always mean acting to ensure the corporation's perpetual existence").

   In light of these principles, courts regularly side with directors and/or management

when they reject imprudent actions on the eve of bankruptcy.  For instance, in <u>Credit Lyonnais</u>

<u>Bank Nederland, N.V. v. Pathe Communs. Corp.</u>, No. 12150, 1991 Del. Ch. LEXIS 215, at *109

(Del. Ch. Dec. 30, 1991) the court found that management "was not disloyal in not immediately

facilitating whatever asset sales were in the best interest of the controlling stockholder" where

management "owed their supervening loyalty to [ ] the corporate entity."  The court noted that the

controlling shareholder "had gotten himself into a corner.  He needed to liquidate assets to raise

capital.  [Management] could reasonably suspect that *he might be inclined to accept fire-sale*

*prices*."  <u>Id</u>. at 109 (emphasis added).

   Similarly, Delaware courts have rejected claims against directors who reasonably

determine that insolvency is the best path forward.  <u>See</u> <u>e</u>.g., <u>Barsa v. Theseus Strategy Grp., LLC</u>

<u>(In re Old BPSUSH, Inc.)</u>, Adv. Pro. No. 19-50726 (BLS), 2020 Bankr. LEXIS 1697, at *22-23

(Bankr. D. Del. June 30, 2020) (granting directors/officers' motion to dismiss trustee's breach of

duty counterclaims; rejecting claims that directors/officers "abdicated their responsibilities to the

Company by filing bankruptcy instead of timely completing the investigation demanded by the

auditor" which "destroyed the Company's value" and finding that the "claims are an 'effort to

second-guess the discretionary business judgments made by a group of disinterested, independent

14

directors as they fought to rescue their company from the brink of financial insolvency'") (citation omitted).

Here, the Amended Complaint is built on the faulty premise that the Company *had* to sell its Fulfillment Business, and because Defendants did not vote to sell that business, they violated their fiduciary duties.  However, the case law is clear that directors of insolvent corporations owe duties to creditors as well as shareholders, and directors may reasonably determine not to continue the corporation's existence as a going concern.

Moreover, the Amended Complaint acknowledges that Defendants raised concerns about the future of the Technology Assets.  Fortgang allegedly asked "how anyone could make a decision on the sale of the fulfillment business without a model or clarity from Mr. Klunk [the Company's Chief Operating Officer] or Mr. Barbarosh [the Company's Chief Financial Officer] as to what the future of the technology business will look like."  FAC ¶ 123.  Fortgang allegedly then suggested they "wait and understand what will happen with the technology business before the sale of the fulfillment business." Id. ¶ 124.

According to the Amended Complaint, the response from Jane Gol – the Company's President and its controlling shareholder (directly or indirectly) – was that "the Company had no funding to make a future business plan for the technology business absent the sale of the fulfillment business and that Project Verte had two choices:  sell the fulfillment business or cease operations." Id. ¶ 126.  Thus, the Company's purported plan essentially was "*we are not sure what happens if we sell the fulfillment business, but we know what happens if we don't.  So let's sell it.*"  Under these circumstances, it would not be an unreasonable business judgment to determine – unlike Ms. Gol – that the assets should be retained together, as opposed to selling the Fulfillment Business without any plan for the Technology Assets.

Critically, the Amended Complaint does not suggest that management *even considered* the viability of liquidation or bankruptcy or explored the option of a potential bankruptcy with the directors.  Rather, it is simply presented in the Amended Complaint as a binary choice:  either sell the Fulfillment Business or the Company would be forced into bankruptcy.  But there is no discussion whether the Company or the creditors would be better off in bankruptcy. Because the case law is clear that directors of insolvent companies owe duties to creditors as well are shareholders, and that directors may determine not to continue a corporation as a going concern, the central dichotomy presented by the Amended Complaint is a false one, and Defendants did nothing wrong by not approving the sale of the Fulfillment Business, even if that decision meant that the Company likely would be liquidated.

Moreover, the Amended Complaint admits that the "sale" terms were not even finalized.  Specifically, the sale terms did not address (a) whether GPA would use Project Verte's technology, and if so, what would the financial terms be with respect to the Company's sole remaining asset, in the event of a sale of the Fulfillment Business, and (b) what percentage of cash would be paid at closing.  Id.  ¶ 153.  Thus, the Trustee's admission that GPA's "offer" was never finalized is fatal to his claim, because any purported damages would be speculative.

Similarly, the Trustee does not explain why the Board did not reconvene to approve the deal after Defendant Fortgang's resignation on July 30, 2022 (at which time a majority of the Board favored the sale) or why Ms. Gol (Company President and controlling shareholder) did not call a special shareholder's meeting to approve the sale.  The factual allegations, as presented by the Trustee, are illogical and suggest that there was in fact no final deal to approve.

16

## IV.    DELAWARE'S BUSINESS JUDGMENT RULE PROTECTS DIRECTORS, SUCH AS DEFENDANTS, FROM BEING SUED FOR ALLEGEDLY BAD DECISIONS

Delaware's business judgment rule insulates Defendants, as directors, from being sued for allegedly bad business decisions.   Under Delaware law, directors of corporations are protected from liability for making allegedly "poor" decisions pursuant to the business judgment rule.   See In re McDonald's Corp. Shareholder Derivative Litig., 291 A.3d 652, 685 (Del. Ch. 2023) ("Delaware's default standard of review is the business judgment rule. That standard of review presumes that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. . . . the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives.") (citations and internal quotation marks omitted); Brehm v. Eisner, 746 A.2d 244, 264 (Del. 2000) ("Courts do not measure, weigh or quantify directors' judgments."); In re Citigroup Inc. Shareholder Derivative Litig., 964 A.2d 106, 124 (Del. Ch. 2009) (the court looks at "the decision-making process rather than on a substantive evaluation of the merits of the decision.  This follows from the inadequacy of the Court, due in part to a concept known as hindsight bias, to properly evaluate whether corporate decision-makers made a 'right' or 'wrong' decision.").  As the Court in In re Citigroup explained:  "To impose liability on directors for making a 'wrong' business decision would cripple their ability to earn returns for investors by taking business risks.  Indeed, this kind of judicial second guessing is what the business judgment rule was designed to prevent."  Id. at 126.

Applying such standard, federal courts in Delaware (or applying Delaware law) routinely dismiss claims against directors for allegedly making "bad" decisions.  See, e.g., Torch Liquidating Trust v. Stockstill, No. 07-133 Section T(1), 2008 U.S. Dist. LEXIS 19535, at *33

17

(E.D. La. Mar. 13, 2008) (dismissing claims pursuant to Rule 12(b)(6); "the Torch directors and officers made a number of financial decisions . . . that turned out to be poor.  This Court will not question those management decisions when the Amended Complaint fails to allege that the directors and/or officers performed in bad faith and without due care.  While the outcome of their decisions were unfortunate, the Court, bound by the Business Judgment Rule, cannot challenge the decision.") (affirmed 561 F.3d 377 (5th Cir. 2009)); F5 Capital v. Pappas, No. Civ. 9356 (AT), 2016 U.S. Dist. LEXIS 30500, at *27 (S.D.N.Y. Feb. 17, 2016) (granting motion to dismiss; "[t]he crux of the pleadings is that the merger was a poor decision, requiring Star Bulk to incur significant debt in exchange for assets that were overvalued. . . . the Court will not rely on the benefit of hindsight to question the soundness of the board's business decision, nor will the Court assume, without facts suggesting otherwise, that the decision was made in bad faith."); Continuing Creditors' Comm. of Star Telecomms. Inc. v. Edgecomb, 385 F. Supp. 2d 449, 466 & n.14 (D. Del. 2004) (granting motion to dismiss in relevant part; "[t]here is no denying that Star faced dire financial circumstances.  In light of Star's desperate need for capital, the most damning conclusion that can be drawn from the facts pleaded in the Complaint is that the directors, when confronted with the difficult decision of whether to accept the Gotel financing, may have made a poor decision.  But that does not amount to an abdication of responsibility by the Board.").

## V.    THE AMENDED COMPLAINT DOES NOT SUFFICIENTLY PLEAD A BREACH OF FIDUCIARY DUTY

### A.  The Amended Complaint Does Not Sufficiently Plead a Breach of the Duty of Care

"The fiduciary duty of due care requires that directors of a Delaware corporation both:  (1) 'use that amount of care which ordinarily careful and prudent [persons] would use in similar circumstances;' and (2) 'consider all material information reasonably available.'"

Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.), 388 B.R. 548, 568 (Bankr. D. Del. 2008) (citation omitted).

Under "Delaware law a plaintiff cannot 'prove a breach of the duty of care without a showing of gross negligence.'" Liquidation Trust of Solutions Liquidation LLC v. Stienes (In re Solutions Liquidation LLC), 608 B.R. 384, 397-98 (Bankr. D. Del. 2019). "To establish gross negligence, 'a plaintiff must plead . . . that the defendant was 'recklessly uniformed' or acted 'outside the bounds of reason.'" Id. (citation omitted).

The Trustee's allegations do not demonstrate that Defendants failed to use the care which ordinarily careful and prudent persons would use in similar circumstances or that Defendants failed to consider all material information reasonably available. Certainly, the Trustee cannot establish that Defendants engaged in "gross negligence." See, e.g., Barsa, 2020 Bankr. LEXIS 1697 at *27 (dismissing trustee's breach of duty counterclaims; "[t]he Trustee's factual allegations rest mainly [on] conclusory accusations that" the officers' conduct does not reflect "how prudent officers should handle an audit. However, the facts underlying the allegations do not demonstrate anything approaching an extreme departure from the ordinary standard of care. There are no allegations that the Officers were recklessly uninformed or that their handling of the audit fell outside the bounds of reason.").

In Barsa, this Court rejected a claim of breach of the duty of good faith in similar circumstances. The claim alleged that directors "abdicated their responsibilities to the Company by filing bankruptcy instead of timely completing the investigation demanded by the auditor" which "destroyed the Company's value." Id. This Court rejected that argument, holding that there is "no reasonable inference in the Trustee's allegations that the Directors abdicated their responsibilities, acted in an uninformed manner, or acted against the Company's interests." Id.

19

(holding there was "no alleged behavior that rises to the level of bad faith needed" to state a claim for breach of the duty of good faith).

Here, the Trustee essentially is arguing that the decision not to sell the Fulfillment Business was a bad decision. However, second guessing directors' decisions after-the-fact is contrary to well established Delaware caselaw. See, e.g., In re Novell, Inc. S'holder Litig., No. 6032-VCN, 2014 Del. Ch. LEXIS 249, at *30 (Del. Ch. Nov. 25, 2014) ("It is not the Court's job to second-guess decisions made by a majority independent Board which show that its decision-making process and actions were reasonable, though perhaps imperfect."); Barsa, 2020 Bankr. LEXIS 1697 at *36 ("'A claim for bad faith is not stated by second-guessing the Board's actions.' There is no reasonable inference in the Trustee's allegations that the Directors abdicated their responsibilities, acted in an uninformed manner, or acted against the Company's interests.") (citation omitted). As addressed above, Delaware's business judgment rule protects directors from being sued for allegedly making "bad" business decisions.

### B. The Amended Complaint Does Not Sufficiently Plead a Breach of the Duty of Loyalty

The Amended Complaint does not sufficiently plead a breach of the duty of loyalty or the incorporated duty of good faith. See Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006) (the duty of loyalty "encompasses cases where the fiduciary fails to act in good faith."). A breach of the duty of good faith requires a showing of *more* than "gross negligence," which, as established above, the Trustee clearly cannot establish. See McPadden v. Sidhu, 964 A.2d 1262, 1262 (Del. Ch. 2008) ("gross negligence, alone, cannot constitute bad faith"). Moreover, the Trustee cannot show that the Defendants (i) "intentionally act[ed] with a purpose other than that of advancing the best interests of the corporation"; (ii) "act[ed] with the intent to violate applicable positive law"; or (iii) "intentionally fail[ed] to act in the face of a known duty to act, demonstrating a conscious

20

disregard for his duties." Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.), 405 B.R. 527, 540 (Bankr. D. Del. 2009).

Furthermore, there is no basis to infer bad faith where, as set forth above, the decision not to sell the Fulfillment Business can be rationally explained on grounds other than bad faith motive.[6]

Finally, the Trustee's allegations also do not demonstrate that Defendants failed to act in the face of a known duty demonstrating a conscious disregard for their duties. As discussed above, there is no duty to avoid bankruptcy. The Trustee appears to allege that Defendants did not appear for a virtual meeting (that was rescheduled for the next day) and made comments akin to "'nothing you add, nothing you say, nothing you'll do will impact my decision.'" Of course, these comments make sense in the context of the timeline and management's failure to provide new information, as well as Defendants' documented concerns about the merits of the decision to sell the Fulfillment Business. Ultimately, the Trustee is really arguing that the decision not to sell the Fulfillment Business was a bad decision, or that he would not have made the same decision. However, this is insufficient to demonstrate a breach of fiduciary duty.

---

[6]    See In re TIBCO Software Inc. Stockholders Litig., No. 10319-CB, 2015 Del. Ch. LEXIS 265, at *21 (Del. Ch. Oct. 20, 2015) (to satisfy the "high bar to pleading bad faith," the defendant's actions must have been "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.") (citations and internal citations omitted); RSH Liquidating Trust v. Magnacca, 553 B.R. 298, 314 (Bankr. N.D. Tex. June 8, 2016) (absent direct evidence of bad faith, the business judgment rule may only be rebutted in "rare cases where the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith") (internal citations and quotation marks omitted).

1.  **The Specific Allegations Solely Against Defendant Kahlon**

The allegations that Defendant Kahlon acted out of self-interest and was out to exact "revenge" as a result of his separate litigation against the Company for terminating his employment in 2020 in breach of his employment agreement – which had survived the Company's motion for summary judgment and was proceeding to resolution through trial or settlement – are conclusory and illogical.

Considering analogous claims, the District Court in Gavin v. Tousignant (In re Ultimate Escapes Holdings, LLC) determined that allegations that an officer and director attempted to "negotiate his future position in the merged company or some settlement of his rights under his employment agreement" were conclusory and did not establish evidence of a "'soft landing' agreement" with the acquirer or that the decision to merge was "'based on extraneous considerations or influences.'"  551 B.R. 749, 773 (D. Del. Feb. 23, 2016) (adopting findings of fact and conclusions of law).  See also RSH Liquidating Trust, 533 B.R. at 303, 316 (granting Rule 12(b)(6) motion; allegations that CEO and directors "delivered RadioShack into the hands of . . . its largest shareholder, in order to further [the CEO's] personal ambitions" were "speculative and conclusory" where defendants' "had nothing to gain from foreclosure").

Here, the Trustee pleads that (i) Kahlon previously was CEO; (ii) Kahlon was a potential beneficiary of the Kahlon Litigation; and (iii) this issue had not been fully resolved when the Board voted not to sell the Fulfillment Business.  These allegations do not provide any non-speculative basis to determine that Kahlon was "out for revenge" or acting to further his personal interests at the expense of the Company.

The Trustee's claims are further undermined because the interests of Kahlon and the Company were aligned.  The Amended Complaint makes clear that Kahlon, through TNJ, was

a significant shareholder (i.e., TNJ, which was wholly owned by Kahlon and his family, owned 33% of the Company) and controlled two of four board seats.  See In re PLX Tech. Stockholders Litig., No. 9880-VCL, 2018 Del. Ch. LEXIS 336, at *41 (Del. Ch. Oct. 16, 2018) (the ownership by a director of "a large block of common stock would . . . undermine any concern about divergent interest" as "Delaware law presumes that investors act to maximize the value of their own investments.") (citations and internal quotation marks omitted); accord MKE Holdings, Ltd. v. Schwartz, No. 20-2018-0729-SG, 2019 Del. Ch. LEXIS 1285, at *35-36 (Del. Ch. June 27, 2019) (granting motion to dismiss derivative claims brought on behalf of corporate entity (Verdesian) alleging breach of duty by managers; "[t]he Plaintiffs suggest no motive for bad faith . . . save loyalty to Paine.  Paine is the majority owner of Verdesian and benefits when Verdesian increases it[s] value. . . .  [i]ntentional mismanagement of Verdesian would harm both of Paine's sources of gain from Verdesian.  As a result, the inference that the Plaintiffs ask me to draw . . . is not reasonable").

As both a significant shareholder in the Company and a potential beneficiary of the Kahlon Litigation, Kahlon would only stand to benefit from the general survival  and financial success of the Company.

### 2.  The Specific Allegations Solely Against Defendant Fortgang

The Amended Complaint alleges that Defendant Fortgang acted contrary to the Company's best interests to "protect[] his friend" Kahlon.  FAC ¶ 12.   The Trustee specifically alleges that Fortgang, purportedly to help his friend, "sent an email in which he stated that disputes around convertible notes involving debts, liabilities, and shareholders needed to be decided before any vote on selling the fulfillment business."  Id. ¶ 141. However, a fair reading of Fortgang's July 19, 2022 email, which is referenced in FAC ¶ 141 (the "Email"), makes it clear that he is not

refusing to vote on the proposed sale unless concessions are made to Kahlon.[7]  The Email primarily consists of Fortgang's requests to management for information, including requests for (i) "[f]inancial projection for the business"; (ii) "[l]eadership of PV to present on direction for future, including projected cash needs *after* divestment"; and (iii) an "[e]xplanation from CFO around presentation of numbers."  At the end of the Email, Fortgang adds: "I also want to advise my opinion that any disputes between debts, liabilities as well as shareholders around notes that [CFO] Milton [Barbarosh] mentioned on call should be dealt with prior to any vote."  A fair reading of the Email does not support the Trustee's insinuation that Fortgang was attempting to extort a benefit for Kahlon before he would approve of the sale of the Fulfillment Business.  Moreover, nowhere does the Amended Complaint allege that either Fortgang or Kahlon stated, directly or indirectly, at any Board meeting, or in any conversation with anyone at the Company, that they wanted "something" done to personally benefit Kahlon before they would vote on the sale of the Fulfillment Business.  Accordingly, there is no basis to give the Trustee's tortured reading of the Email any credence.

Moreover, the Amended Complaint cannot legitimately call into question the independence of Fortgang based on the vague allegations that Kahlon and Fortgang were friends, lived in the same building, or worked on a prior business venture.  See, e.g., Beam v. Stewart, 845 A.D. 1040, 1050 (D. Del. 2004) ("Allegations of mere personal friendship or a mere outside business relationship . . . are insufficient to raise a reasonable doubt about a director's independence"); In re March Group, No. 2020-0505-MTZ, 2022 Del. Ch. LEXIS 499 at *33 (Del. Ch. Sep. 1, 2022) ("To plead a lack of independence, plaintiffs must clear a high bar that goes

---

[7]     The Email is attached to the Weintraub Declaration (without attachments) as Exhibit C. As noted above, the court may take judicial notice of documents that are "integral to or explicitly relied upon in the complaint."  Doe, 30 F. 4th at 342.

beyond intersecting social circles, previous business relationships, or both.").

Accordingly, the Trustee's breach of fiduciary duty claim must fail, as a matter of law.

## VI.    THE COMPANY'S CERTIFICATE OF INCORPORATION INSULATES DEFENDANTS, AS DIRECTORS, FROM LIABILITY FOR BREACH OF FIDUCIARY DUTY

The Amended Complaint also fails, as a matter of law, because the Company's Certificate of Incorporation insulates Defendants, as directors, from liability for breach of fiduciary duty.

Liability for any breach of the duty of care can be exculpated by an appropriate provision in the corporation's charter.  See In re Answers Corp. S'holders Litig., No. 6170-VCN, 2012 Del. Ch. LEXIS 76, at *21 (Del. Ch. Apr. 11, 2012) ("Answers' Certificate of Incorporation contains a provision exculpating the Board from monetary liability for breaches of the duty of care. Thus, in order to survive the Board's motion to dismiss, the Complaint must state a claim that the Board breached its duty of loyalty.").

Here, the Company's Certificate of Incorporation provides at Article IX(A) that "[t]o the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director."  See Weintraub Declaration, Exhibit E.[8]  Thus, the exculpation clause in the Company's

---

[8]      The Court is permitted to take judicial notice of the Certificate of Incorporation.  See In re Orbit/FR Stockholders Litig., No. 2018-0340-SG, 2023 Del. Ch. LEXIS 19, at *13 n.76 (Del. Ch. Jan. 24, 2023) ("On a motion to dismiss, Delaware courts may take judicial notice of the terms of a corporation's governing certificate of incorporation.") quoting Tvi Corp. v. Gallagher, No. 7798-VCP, 2013 Del. Ch. LEXIS 260, at *14 (Del. Ch. Oct. 28, 2013)); In re Answers, 2012 Del. Ch. LEXIS 76, at *21 n.36 ("The court may take judicial notice of the contents of the certificate of incorporation of a Delaware corporation where . . . there is no dispute among the parties as to its actual contents (as opposed to the legal effect of those contents).") (citations and internal quotation marks omitted).

Certificate of Incorporation prevents the recovery of damages for any breach of fiduciary duty predicated on a breach of the duty of care.  See McElrath v. Kalanick, 224 A.3d 982, 991 (Del. 2020) ("Uber's Certificate of Incorporation exculpates its directors from monetary liability for fiduciary duty breaches to the fullest extent permitted by the Delaware General Corporation Law."); AmerisourceBergen Corp. v. Leb. Cty. Employees' Ret. Fund, 243 A.3d 417, 433 (Del. 2020) ("AbbVie's certificate of incorporation exculpated its directors from liability for a breach of duty of care"); Firemen's Ret. Sys. of St. Louis v. Sorenson, No. 2019-0965-LWW, 2021 Del. Ch. LEXIS 234, at *19 (Del. Ch. Oct. 5, 2021) ("Because Marriott's certificate of incorporation contains a provision exculpating its directors for breaches of the duty of care as permitted under 8 Del. C. § 102(b)(7), the plaintiff must plead with particularity facts that support a meritorious claim for breach of the duty of loyalty.") (internal quotation marks omitted).

Here, in light of the Company's exculpation clause, the only potential claim against directors would be for breaching their duty of loyalty.  However, as set forth above, the allegations in the Amended Complaint do not sufficiently state a claim for breach of the duty of loyalty. Accordingly, the Trustee's breach of fiduciary duty claim is barred by the Company's exculpation clause in its Certificate of Incorporation.

## VII.   THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE, WITHOUT LEAVE TO REPLEAD

The Court should not permit the Trustee to replead the Complaint for a second time. See Phillips v. Cty. of Allegheny, 515 F.3d 224, 245 (3d Cir. 2008) ("if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment *unless such an amendment would be inequitable or futile*") (emphasis added); Davis v. Neal, No. 1:21-cv-01773-TLA, 2023 U.S. Dist. LEXIS 144106, at *8 (D. Del. Aug. 17, 2023) (dismissing claims "with prejudice because the factual allegations in the Complaint tell us that amendment would be futile").

Here, the allegations in the Amended Complaint do not give rise to any liability for breach of fiduciary duty.  Accordingly, the Trustee cannot state a claim as a matter of law and any further attempt to amend would be futile.

### Conclusion

For the reasons set forth herein, the Court should grant Defendants' motion in its entirety and dismiss the Trustee's Amended Complaint with prejudice, and not allow the Trustee to replead again.

OF COUNSEL:

Leonard Weintraub
  (admitted *pro hac vice*)
Noah Bunzl (admitted *pro hac vice*)
Paduano & Weintraub LLP
1251 Avenue of the Americas, 9th Floor
New York, NY 10020
(212) 785-9100
lw@pwlawyers.com
nhb@pwlawyers.com

Dated: November 30, 2023

*/s/ Evan Williford*

Evan O. Williford (No. 4162)
The Williford Firm LLC
1007 N. Orange Street
Suite 235
Wilmington, DE  19801
(302) 654-5924
evanwilliford@thewillifordfirm.com

*Attorneys for Defendants*
*Julian Kahlon and Graham Fortgang*