# EXHIBIT B

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/23/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JULIAN KAHLON,

                Plaintiff,

-against-

PROJECT VERTE INC.,

                Defendant.

20-cv-3774 (MKV)

OPINION & ORDER
ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT

MARY KAY VYSKOCIL, United States District Judge:

    Before the Court are Defendant's motion for summary judgment on all of Plaintiff's claims [ECF No. 80], Plaintiff's motion for summary judgment on Defendant's counterclaim [ECF No. 86], and a motion to seal certain documents filed in connection with those motions [ECF Nos. 77, 78, 79]. For the reasons set forth below, Defendant's motion for summary judgment is DENIED IN PART and GRANTED IN PART. Plaintiff's motion for summary judgment is DENIED. The motion to seal is DENIED.

## I. BACKGROUND[1]

### A. Background Facts

    Defendant Project Verte, Inc. is a technology start-up that helps retailers "expand their sales channels and streamline their fulfillment operations." Def. 56.1 ¶ 1; Pl. Counter 56.1 ¶ 1. Plaintiff Julian Kahlon ("Kahlon") is the former Chief Executive Officer ("CEO") of Project Verte. *See* Def. 56.1 ¶¶ 16, 47; Pl. Counter 56.1 ¶¶ 16, 45; Pl. 56.1 ¶¶ 4, 7; Def. Counter 56.1 ¶¶ 4, 7. Kahlon owned a company called TNJ Holdings, Inc. that was one of the initial investors in Project Verte.

---

[1] The facts are taken from the parties' Local Civil Rule 56.1 statements [ECF Nos. 82 ("Def. 56.1"), 91 ("Pl. 56.1"), 96 ("Def. Counter 56.1"), 100 ("Pl. Counter 56.1")], the affidavits and declarations submitted in connection with this motion, and the exhibits attached thereto [ECF Nos. 83, 85, 88, 90, 93, 94, 95, 105]. Unless otherwise noted, where only one party's 56.1 statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely disagrees with the inferences to be drawn from that fact.

*See* Def. 56.1 ¶¶ 2, 4; Pl. Counter 56.1 ¶¶ 2, 4. The other initial investors were non-parties Amir Chaluts, Jane Gol, and various entities they controlled, collectively referred to as the AJ Group. *See* Def. 56.1 ¶¶ 2, 3, 5, 6; Pl. Counter 56.1 ¶¶ 2, 3, 5, 6. Julian Kahlon's father, Jossef Kahlon, was also involved in Project Verte through TNJ. *See* Def. 56.1 ¶ 21; Pl. Counter 56.1 ¶¶ 4, 11.

The initial investors entered into various agreements to fund Project Verte and to appoint the members of its board of directors. *See* Def. 56.1 ¶¶ 2, 3, 5, 6, 7, 8; Pl. Counter 56.1 ¶¶ 2, 3, 5, 6, 7, 8. In particular, the initial investors entered into "Line of Credit Agreements" that were set to expire at the end of December 2019. Def. 56.1 ¶¶ 8, 9; Pl. Counter 56.1 ¶¶ 8, 9. The parties disagree about the rest of the financing. There is no dispute that Project Verte covered its operating expenses by issuing "capital call notices" to the AJ Group and TNJ approximately every two weeks. Def. 56.1 ¶ 10; Pl. Counter 56.1 ¶ 10. There is also no dispute that the AJ Group provided funding pursuant to the capital call notices, while TNJ either "stated that it would not fund," or did not have the money to fund. Def. 56.1 ¶¶ 11, 12; Pl. Counter 56.1 ¶¶ 11, 12. However, Kahlon avers that TNJ "directly paid various third parties," the AJ Group "did not always pay vendors who were listed on capital call notices," and Jossef Kahlon negotiated a refund that "should have been credited" towards TNJ's capital contributions. Pl. Counter 56.1 ¶¶ 11, 12.

The AJ Group appointed Gol and Chaluts to the Board of Project Verte. Def. 56.1 ¶ 15; Pl. Counter 56.1 ¶ 15. TNJ initially appointed Julian Kahlon as well as Yafit Lev-Aretz, whom Kahlon describes as the only "independent" director because she was the only member of the board who was not a shareholder. Def. 56.1 ¶¶ 15, 20; Pl. Counter 56.1 ¶¶ 15, 20, 23(d). Julian Kahlon later resigned from the Board, and TNJ appointed his father Jossef Kahlon as Julian's replacement. *See* Def. 56.1 ¶¶ 21; Pl. Counter 56.1 ¶¶ 4, 21.

On February 20, 2020, Project Verte's Board held a meeting, although it seems Jossef Kahlon was not present. Def. 56.1 ¶ 23; Pl. Counter 56.1 ¶ 23; *see* Pl. Counter 56.1 ¶ 25. Gol informed the Board that Project Verte was out of cash, the Line of Credit Agreements had expired, and the "stockholders were no longer willing to continue" funding Project Verte in the manner it had been operating. *See* Def. 56.1 ¶¶ 23, 24; Pl. Counter 56.1 ¶¶ 23, 24. Kahlon adds that Aretz "insisted" that, without Jossef Kahlon present, the Board could not hold a vote on Gol's proposal for emergency financing, the convertible notes at the heart of this case. Pl. Counter 56.1 ¶ 25.

B. **The Convertible Notes**

On February 24, 2020, the Board met again to discuss the financial situation of Project Verte. Def. 56.1 ¶ 26; Pl. Counter 56.1 ¶ 26. Gol proposed "an emergency bridge loan of up to $5,000,000 that would be offered pro rata to all Initial Stockholders of the Company by way of a convertible note." Def. 56.1 ¶ 26; Pl. Counter 56.1 ¶ 26. Convertible notes are a form of debt-financing that give the note-holders equity in the company. The Board met again over the next two days and, on February 26, 2020, voted to approve the convertible notes, although Jossef Kahlon left before the vote. Def. 56.1 ¶¶ 26–28; Pl. Counter 56.1 ¶¶ 26–28. According to Kahlon, Jossef Kahlon was "concerned" about the "dilution of TNJ's equity in Project Verte." Pl. Counter 56.1 ¶ 28.

On February 27, 2020, a capital call notice for approximately $905,000 issued. Def. 56.1 ¶ 29; Pl. Counter 56.1 ¶ 29. It included a request for funding of the payroll and rent obligations that Project Verte imminently had to pay. Def. 56.1 ¶¶ 31, 32; Pl. Counter 56.1 ¶¶ 31, 32. "Once the board approved issuance of the convertible notes, Mr. Chaluts and Ms. Gol, through their entities, funded $603,363.50 of the February 27, 2020 capital call pursuant to the convertible notes." Def. 56.1 ¶ 34; Pl. Counter 56.1 ¶ 34. Project Verte offers evidence that the AJ Group

3

funded the capital call "even though the convertible notes had not been executed" by Julian Kahlon because Gol and Chaluts "believed that Plaintiff would execute the notes shortly" and they "wanted to ensure that Project Verte's payroll and rent obligations were met." Def. 56.1 ¶ 35 [ECF No. 90 ("Gol Decl.") ¶ 41].

The same day, February 27, 2020, Sara Rubenstein, the corporate secretary of Project Verte, sent the convertible notes to Kahlon "to execute in his capacity as CEO of Project Verte." Def. 56.1 ¶ 33; Pl. Counter 56.1 ¶ 33. Kahlon offers evidence that, although she was the corporate secretary, Rubenstein also provided legal advice to Project Verte "on an *ad hoc* basis" and that she was simultaneously serving as general counsel for a separate company owned by Gol and Chaluts, where she reported to Gol and Chaluts. *See* Pl. Counter 56.1 ¶ 33 [ECF No. 105-24 ("Rubenstein Dep.") at 28]. In addition to Rubenstein's email instructing Kahlon to sign the convertible notes, Kahlon received a series of communications from outside counsel for Project Verte, Andrew Hulsh, instructing him to sign the notes. Def. 56.1 ¶ 36; Pl. Counter 56.1 ¶ 36.

Project Verte argues that Kahlon "refused" to carry out the Board's instruction to execute the convertible notes [ECF No. 81 ("Def. MSJ") at 22]. *See* Def. 56.1 ¶ 41. Kahlon disputes this characterization and offers evidence that he had reservations about the reasonableness of the Board's instruction. He offers evidence that Project Verte "had previously decided to hire Ernst & Young to conduct a financial audit for the purpose of raising funds" but, "as of the end of 2019," that audit "was not completed; thus, Project Verte did not have certified financials" on which to base Gol's proposal for the emergency financing. Pl. Counter 56.1 ¶ 23(a) [ECF No. 105-4 ("Gol Dep.") at 281]. Yet the "convertible notes referenced a $50,000,000 valuation" for Project Verte "based on discussions at three board meetings." Pl. Counter 56.1 ¶ 26; Gol Dep. at 381–82.

4

> On February 28, 2020, Kahlon wrote to Hulsh, saying:
>
> Let me understand something. You are telling me to sign documents that I have just received, just because you're telling me that they're okay to sign?
>
> Isn't it the company's right to have a chance to raise funds on better terms?
>
> Andrew, as the CEO of Project Verte, I'm asking you to withhold from discussing these matters with anyone within or outside of the company until I fully understand what it is that I am signing. Now please, help me understand. The AJ Group is treating Project Verte as if I/Project Verte will not sign the documents, they will not fund and close the business and if I/Project Verte will sign they will fund. Just to make a couple of hundred thousand dollars and maybe get some equity. It's clear that there is money to fund.
>
> I'm not your rubber stamp and you will respect me as I have respected you. Today's incident opened my eyes. I had asked Sara 3 times for all of Project Verte's documentation. I have them, yes, but I want to make sure that the documents are all aligned. Especially with all the amendments and agreements that had gone back and forward. I WAS IGNORED. Due to my latest findings regarding Sara, the facts are: 1. She is not Project Verte's general counsel, although she led me to believe that she was. 2. She is the in-house counsel for the AJ Group, which poses a massive conflict of interest. 3. She is Project Verte's secretary, and certainly not acting like one. To think that she is in charge of all the documentation with this obvious conflict of interest keeps me up at night.

Pl. Counter 56.1 ¶ 36; Davis Decl. ¶ 27, Ex. 26.

Over the course of several days, "Hulsh reiterated the Board's instruction that [Kahlon] sign the convertible notes and communicated to [Kahlon] that he was obligated to do so." Def. 56.1 ¶ 36; Pl. Counter 56.1 ¶ 36. Kahlon offers evidence that he responded, "I would love to sign if I knew what I was signing and had all the details." Pl. Counter 56.1 ¶ 37; Davis Decl., ¶ 27, Ex. 26. Kahlon went on to say that he had not received information and paperwork he had requested and that it was his "responsibility to know what [he was] signing." *Id.*

On February 29, 2020, Hulsh admonished Kahlon, "As both Sara and I indicated, the execution of these documents is ***a critical matter for Project Verte, the failure of which may result in the Company's inability to discharge its many obligations, including current payroll***." Def.

5

56.1 ¶ 38; Pl. Counter 56.1 ¶ 38 (emphasis in the original). Kahlon did not sign the notes. Def. 56.1 ¶ 41; Pl. Counter 56.1 ¶ 41. On March 3, 2020, the Board "authorized another officer or director to sign the convertible notes." Def. 56.1 ¶ 43; Pl. Counter 56.1 ¶ 43. On March 5, 2020, the Board convened, without Jossef Kahlon present, and voted to terminate Julian Kahlon for cause "due to his failure to follow the Board's directives" with respect to the convertible notes. Def. 56.1 ¶¶ 44, 46, 48; Pl. Counter 56.1 ¶¶ 42–46. Outside counsel to Project Verte issued a termination notice to Kahlon the same day. Def. 56.1 ¶ 47; Pl. Counter 56.1 ¶ 45. The Termination Notice cites a section of the agreement governing Kahlon's employment as CEO [ECF No. 1-1 ("Employment Agreement")] which states that Project Verte may terminate him for cause based on a "repeated or substantial refusal, failure, or inability to perform . . . his duties." Def. 56.1 ¶ 49; Pl. Counter 56.1 ¶ 47; Employment Agreement § 6.9.1(b).

### C. The Employment Agreement

The parties agree that the Employment Agreement governed the relationship between Kahlon, as CEO, and Project Verte, along with the company's Amended and Restated Bylaws. *See* Def. 56.1 ¶¶ 16, 19; Pl. Counter 56.1 ¶¶ 16, 19; Pl. 56.1 ¶¶ 4, 5; Def. Counter 56.1 ¶¶ 4, 5. Under the heading "Title," section 3.1 of the Employment Agreement provides that Kahlon "shall serve as the Chief Executive Officer" and "shall report directly to, and be subject to the direction of, the Board of Directors." Employment Agreement § 3.1; Def. 56.1 ¶ 17; Pl. Counter 56.1 ¶ 17. Similarly, the Bylaws state that the CEO "shall see that all orders and resolutions of the Board of Directors are carried into effect" [ECF No. 90-1 ("Bylaws") § 5.8].

Under the heading, "Duties, Responsibility and Authority," section 3.2 of the Employment Agreement provides that Kahlon "shall have such responsibilities, duties and authority as are customarily incident to his position as Chief Executive Officer and as may *reasonably* be assigned

6

to him by the Board from time to time." Employment Agreement § 3.2 (emphasis added); Def. 56.1 ¶ 18; Pl. Counter 56.1 ¶ 18. Section 3.2 further provides that Kahlon "shall have such authority as is commensurate with the position" of CEO. Employment Agreement § 3.2. "Without limiting the foregoing" statement of Kahlon's authority, the Employment Agreement then provides an enumerated list of decisions the CEO has authority to make "without further Board approval, once the annual budget has been approved by the Board." *Id.* The list includes, among other things, the authority to "enter into, amend in any material respect, waive or terminate any contract (other than a Related Party Agreement) having a value up to $1,000,000 and in accordance with the approved budgets," *id.* § 3.2.3, and to settle lawsuits involving less than $25,000, *id.* § 3.2.7. A "Related Party Agreement" is defined to include any agreement or arrangement between Project Verte and any stockholder of Project Verte. *Id.* § 3.2.

The Employment Agreement provides that Kahlon's base salary as CEO was $140,000 per year. Employment Agreement § 5.1; Def. 56.1 ¶ 16; Pl. Counter 56.1 ¶ 16; Pl. 56.1 ¶ 9; Def. Counter 56.1 ¶ 9. It describes other kinds of compensation, such as bonuses, and benefits. *See* Employment Agreement § 5.

The Employment Agreement also governs termination. It provides that "[e]ither party may terminate the Executive's employment with the Company at any time for any reason" on 30 days' notice. Employment Agreement § 6. However, such notice is not required if "the Executive's employment is terminated by the Company for 'Cause' (subject to the Executive's ability to cure the conduct giving rise to such termination for Cause, if and to the extent permitted under this Agreement)." *Id.* Termination for cause also results in the loss of certain compensation and benefits. *See id.* "Cause" is defined to include "the Executive's repeated or substantial refusal, failure, or inability to perform . . . his duties." Employment Agreement § 6.9.1(b).

7

D. **Procedural History**

Kahlon initiated this action in May 2020 by filing a complaint, with the Employment Agreement and his notice of termination attached [ECF Nos. 1 ("Cmpl."), 1-1, 1-2]. The Complaint asserts as its first cause of action "breaches of the Employment Agreement" based on, among other allegations, the failure of Project Verte to "provide the required thirty (30) day cure period . . . prior to terminating Kahlon" and its refusal to "provide compensation to Kahlon as required under his Employment Agreement upon termination." Cmpl. ¶ 64; *see id.* ¶¶ 60–67. Second, the Complaint asserts claims under the New York Labor Law for withheld and deducted wages. Cmpl. ¶¶ 68–75. Third, it asserts a claim for a declaratory judgment stating that Kahlon "did not engage in any activity that warranted terminating him for cause" and that he is, therefore, entitled to certain compensation and benefits under Section 6.1 of the Employment Agreement. Cmpl. ¶¶ 76–80. Fourth, the Complaint asserts a claim for violation of the duty of good faith and fair dealing. Cmpl. ¶¶ 81–85. Fifth, it asserts a claim based on the alleged failure of Project Verte to provide Kahlon with notice of the availability of continued health benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. §§ 1161 *et seq*. Cmpl. ¶¶ 86–90.

Project Verte filed an answer and counterclaim, which it later amended [ECF Nos. 14, 21 ("AAC")]. Project Verte asserts that Kahlon breached the Employment Agreement. AAC ¶¶ 79–85. Specifically, it alleges that Kahlon never submitted a budget for Board approval and, therefore, all of Kahlon's actions on behalf of Project Verte were "unauthorized" under the Employment Agreement. AAC ¶¶ 81, 82. For example, Project Verte alleges that Kahlon improperly disclosed confidential information to Geodis Logistics LLC, a logistical services company that Project Verte had retained, and Geodis then sued Project Verte. AAC ¶¶ 10–12. Project Verte further alleges

that, after the suit was filed, Kahlon, without authorization from the Board, sent his father Jossef Kahlon to a meeting with the CEO of Geodis that "severely hindered the settlement discussions." AAC ¶ 13. Project Verte also alleges that Kahlon breached the Employment Agreement by entering into a Related Party Agreement without Board approval when Kahlon hired his father, who was also a shareholder. AAC ¶¶ 41–48. Project Verte offers a number of other allegations in support of its counterclaim.

Project Verte filed a motion for summary judgment to dispose of all of Kahlon's claims [ECF Nos. 80, 81 ("Def. MSJ"), 82 ("Def. 56.1"), 83, 85, 90]. Kahlon filed a brief opposing that motion with respect to his claims for breach of the Employment Agreement and violations of the New York Labor Law, "conced[ing] dismissal" of his claims for declaratory judgment and violation of COBRA notice requirements, and effectively conceding dismissal of his claim for breach of the duty of good faith and fair dealing [ECF No. 101 ("Pl. Opp.") at 24 n.1]. Project Verte filed a reply in further support of its motion [ECF No. 103].

Kahlon also filed a cross-motion for summary judgment to dispose of Project Verte's counterclaim for breach of the Employment Agreement [ECF Nos. 86, 87 ("Pl. MSJ"), 91 ("Pl. 56.1"), 102]. Project Verte opposes that motion [ECF No. 92 ("Def. Opp."), 93, 94, 95, 96 ("Def. Counter 56.1")]. Kahlon declined to file a reply [ECF No. 102].

## II. LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 69 (2d Cir. 2015). The moving party bears the initial burden of demonstrating the absence of a dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

9

The court "may not make credibility determinations or weigh the evidence." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). The court "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Id*. If there is evidence in the record that supports a reasonable inference in favor of the opposing party, summary judgment is improper. *Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transportation Auth.*, 11 F.4th 55, 64 (2d Cir. 2021). In a contract dispute, summary judgment is generally inappropriate unless the contract is "wholly unambiguous." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008); *see Am. Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 316 (2d Cir. 2006) (a contract is ambiguous "if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.").

### III. DISCUSSION

#### A. Project Verte Is Not Entitled to Summary Judgment on Kahlon's Claim for Breach of the Employment Agreement.

Project Verte is not entitled to summary judgment on Kahlon's claim for breach of the employment agreement. Kahlon argues that Project Verte breached the Employment Agreement because it terminated him without Cause, as defined in the contract, without 30 days' notice, without compensation to which he is entitled, and without an opportunity to cure any conduct that would support his termination for Cause. Project Verte argues that it properly terminated Kahlon for Cause. The Court cannot conclude that there is no genuine dispute as to any material fact and Project Verte is entitled to judgment as a matter of law.

The Board voted to terminate Kahlon for cause on the ground that he "refused" to sign the convertible notes that the Board had approved and instructed Kahlon to sign. Def. 56.1 ¶¶ 44, 46,

10

48; Pl. Counter 56.1 ¶¶ 42–46; Termination Notice at 1.  The Termination Notice cited section 3.1 of the Employment Agreement and section 5.8 of the Bylaws, which respectively state that, as CEO, Kahlon was "subject to the direction of" the Board and required to "see that all orders and resolutions of the Board are carried into effect." Termination Notice at 2.  The Termination Notice also cited section 6.9.1(b) of the Employment Agreement, which states that "the Executive's repeated or substantial refusal, failure, or inability to perform . . . his duties" supports termination for "Cause." Termination Notice at 1.

As an initial matter, Kahlon offers evidence that raises a dispute whether he "refused" to sign the convertible notes.  Kahlon offers evidence that he was open to signing the notes if he received information that he needed to assure himself him that he could sign the notes consistent with his obligations to the company and his "responsibility to know what [he was] signing." Pl. Counter 56.1 ¶ 37; Davis Decl., ¶ 27, Ex. 26 (saying, "I would love to sign if I knew what I was signing and had all the details," and asserting that he had not received information and paperwork he had requested).  To be sure, Kahlon did not sign the notes between February 27, 2020, when Rubenstein first instructed him to do so, and March 3, 2020, when the Board authorized someone else to sign them instead.  Def. 56.1 ¶¶ 41, 43; Pl. Counter 56.1 ¶¶ 41, 43.  But Kahlon denies that his conduct during that relatively short timeframe represented a "refusal" to sign the notes.  The Court cannot make credibility determinations, or weigh the evidence, and it must draw all reasonable inferences in favor of Kahlon, the party opposing summary judgment.  *See Jaegly*, 439 F.3d at 151.  As such, the Court cannot simply reject Kahlon's protestation, supported by some evidence, that he was taking steps to understand what his duties as CEO required of him, in contrast with refusing to perform those duties.

11

Moreover, the Employment Agreement suggests that Kahlon was duty-bound to honor only the *reasonable* instructions of the Board. Employment Agreement § 3.2 (providing that the CEO's "duties" include tasks that "may *reasonably* be assigned to him by the Board from time to time") (emphasis added); Def. 56.1 ¶ 18; Pl. Counter 56.1 ¶ 18. Project Verte maintains that, under the Employment Agreement, as well as the Bylaws, Kahlon was required to carry out any and every instruction of the Board, without regard for the nature of the instruction. But the Employment Agreement is not "wholly unambiguous" on that point. *Topps*, 526 F.3d at 68; *see Am. Home Assur. Co.*, 446 F.3d at 316. Indeed, such an agreement might not be enforceable. *See* 5 Williston on Contracts § 12:1 (4th ed.).

Kahlon has offered evidence that he had reservations about the reasonableness of the Board's instruction that he sign the notes. *See* Pl. Counter 56.1 ¶ 36; Davis Decl. ¶ 27, Ex. 26. For example, Kahlon told Hulsh that he was concerned about a conflict of interest. *Id.* Kahlon also offers some evidence that he had reason to question the instructions he received. In particular, Kahlon offers evidence that the convertible notes referenced a valuation of Project Verte that was not based on any "certified financials." Pl. Counter 56.1 ¶ 23(a); *see* Gol Dep. at 281, 381–82. Moreover, he offers evidence that Hulsh admonished Kahlon that he was obligated to sign the notes without understanding what he was signing, let alone agreeing that he was acting in the best interest of Project Verte, because the company would not be able to meet its payroll and rent obligations unless Kahlon signed the notes. Def. 56.1 ¶ 38; Pl. Counter 56.1 ¶ 38. However, it is undisputed that, when Hulsh issued that admonition, the AJ Group had already provided the funding "to ensure that Project Verte's payroll and rent obligations were met." Def. 56.1 ¶¶ 34, 35; Pl. Counter 56.1 ¶¶ 34, 35.

12

That the AJ Group provided the funding before the convertible notes were executed also bears on Kahlon's argument that Project Verte breached the Employment Agreement because it did not give him an opportunity to cure any conduct that would support his termination for Cause. Project Verte argues that Kahlon was not entitled to notice and an opportunity to cure because of the time-sensitive nature of the emergency financing proposal. But, in the light of the timeline set forth above, there is a triable dispute whether Kahlon had "ability to cure" his conduct and should have been "permitted" to do so. Employment Agreement § 6. Because there is evidence in the record that supports reasonable inferences in favor of Kahlon, it would be inappropriate to grant Project Verte summary judgment on Kahlon's claim for breach of the Employment Agreement. *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 64.

### B. Project Verte Is Entitled to Summary Judgment on Kahlon's COBRA Claim.

The Complaint asserts a claim against Project Verte based on its alleged failure to provide Kahlon with notice of the availability, after his termination, of continued health insurance coverage under COBRA. Cmpl. ¶¶ 86–90. However, Kahlon now "concedes dismissal" of that claim. Pl. Opp. at 24 n.1. There is no dispute that the Termination Notice, which Kahlon attached to the Complaint, stated that he would "receive notice" of "any rights to continuation of benefits under COBRA." Def. 56.1 ¶ 51; Pl. Counter 56.1 ¶ 48. More to the point, there is no dispute that such notice was later sent to Kahlon at his residence. *See* Def. 56.1 ¶¶ 52–55; Pl. Counter 56.1 ¶¶ 49–51. Accordingly, there is no material dispute, and Project Verte is entitled to judgment as a matter of law on Kahlon's COBRA claim.

### C. Kahlon's Declaratory Judgment Claim Is Dismissed as Duplicative.

Kahlon likewise "concedes dismissal" of his claim for a declaratory judgment. Pl. Opp. at 24 n.1. The Complaint seeks a declaratory judgment stating that Kahlon "did not engage in any activity that warranted terminating him for cause" and, therefore, he has a right to compensation

13

and benefits under the Employment Agreement.  Cmpl. ¶¶ 76–80.  The Court agrees with both parties that the claim should be dismissed.

The decision whether to award relief under the Declaratory Judgment Act ("DJA") lies within the discretion of the district court.  28 U.S.C. § 2201(a) (stating that the court "may declare" the rights of the party seeking a declaratory judgment); *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005).  In exercising that discretion, a district court considers "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty."  *Duane Reade*, 411 F.3d at 389.  Kahlon's claim for breach of the Employment Agreement "'will necessarily settle the issues for which the declaratory judgment is sought,' meaning that the DJA claim 'will serve no useful purpose' and will not 'serve to offer relief from uncertainty.'"  *City of Perry, Iowa v. Procter & Gamble Co.*, 188 F. Supp. 3d 276, 286 (S.D.N.Y. 2016) (quoting *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 311–12 (S.D.N.Y. 2010)); *see id*. ("Courts generally reject a DJA claim when other claims in the suit will resolve the same issues.").  Accordingly, the Court exercises its discretion and dismisses Kahlon's claim for a declaratory judgment as duplicative.

### D. Kahlon's Claim for Breach of the Duty of Good Faith and Fair Dealing Is Dismissed as Duplicative.

The Complaint asserts, as its "fourth cause of action," a claim for "breaches of the duty of good faith and fair dealing."  Cmpl. ¶¶ 81–85 (emphasis omitted).  Project Verte argues that the Court should dismiss this claim as duplicative of Kahlon's claim for breach of the Employment Agreement because both claims are based on the same factual allegations.  Def. MSJ at 1, 12–13.  Kahlon purports to disagree, but he concedes, as he must, that he cannot maintain "an independent" claim for breach of the duty of good faith and fair dealing.  Pl. Opp. at 24.

14

It is well established that "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003) (alteration omitted) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)). Kahlon does not argue that he has a claim for breach of the duty of good faith and fair dealing that arises out of different facts from his claim for breach of the Employment Agreement. *See* Pl. Opp. at 23–24. Rather, he confusingly asserts that his claim for breach of the duty of good faith and fair dealing, "while pled separately," merely reflects that his "theory of [his] breach of contract claim" is "predicated on" the "bad faith" of Project Verte "in interpreting . . . Plaintiff's Employment Agreement." Pl. Opp. at 23. Kahlon then asserts that his "contract claims predicated on [this theory] should not be dismissed. Pl. at 23–24. As explained above, the Court agrees that Kahlon's claim for breach of the Employment Agreement survives summary judgment. However, his separately-pled claim for breach of the duty of good faith and fair dealing, based on the exact same facts, must be dismissed. *See ARI & Co.*, 273 F. Supp. 2d at 522; *see also, e.g.*, *Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, 361 F. Supp. 2d 283, 298 (S.D.N.Y. 2005).

### E. Kahlon's Claims under NYLL Sections 193 and 198 Are Dismissed.

Kahlon asserts claims for violations of New York Labor Law Sections 193 and 198 based on the failure of Project Verte to pay wages to which Kahlon believes he is entitled under the Employment Agreement. As an executive who earned more than $900 per week, Kahlon cannot recover under Section 198. *See* N.Y. Lab. L. § 198-c(3). Kahlon also cannot recover under Section 193, which prohibits unlawful "deductions" from wages, in contrast with a failure to pay wages altogether. N.Y. Lab. L. § 193. *See Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 728

15

(S.D.N.Y. 2020) ("The law in this district is clear that a failure to pay, or a withholding, of wages does not constitute a "deduction" within the meaning of § 193.").

### F. Kahlon Is Not Entitled to Summary Judgment on the Counterclaim for Breach of the Employment Agreement.

Kahlon filed a motion seeking summary judgment on Project Verte's counterclaim that Kahlon breached the Employment Agreement. However, Kahlon's argument makes little sense. He argues that, because he was an at-will employee, there was no employment contract for him to breach. Pl. MSJ at 4 ("Project Verte cannot sustain a claim for breach of contract because Mr. Kahlon was an at- will employee. An at-will employment arrangement is not contractual, does not create an employment contract, and cannot give rise to a claim of breach of contract."). Project Verte pointed out that that position is impossible to square with Kahlon's own claim for breach of the Employment Agreement. Def. Opp. at 1–2. Kahlon then declined to file a reply. The Employment Agreement, which Kahlon attached to the Complaint and is part of the record in this case, is a contract that binds both parties. As such, Project Verte can assert a claim for breach of contract under the Employment Agreement.

Project Verte argues that all of Kahlon's actions on behalf of Project Verte were "unauthorized," and breached the Employment Agreement, because the Board never approved an annual budget while Kahlon was CEO. Def. Counter 56.1 ¶ 15 ("Plaintiff's Employment Agreement authorized him to take actions in his capacity as CEO only after the board of directors had approved an annual budget, which was not the case during Plaintiff's tenure as CEO."). This argument is unpersuasive. The Employment Agreement provides that Kahlon "shall have such authority as is commensurate with the position" of CEO and then provides an enumerated list of decisions the CEO has authority to make "without further Board approval, once the annual budget has been approved by the Board." Employment Agreement § 3.2. The Employment Agreement

16

specifies that the enumerated list does not "limit[] the foregoing," general statement of the CEO's authority. *Id.* Thus, Kahlon had authority "commensurate with [his] position" as CEO, even in the absence of an approved budget. Employment Agreement § 3.2.

Nevertheless, Kahlon has not met his burden to show that there are no material disputes and Kahlon is entitled to judgment as a matter of law. For example, Project Verte alleges that Kahlon breached the Employment Agreement when he hired his father, Jossef Kahlon, who was also a shareholder, without Board approval. AAC ¶¶ 41–48. Kahlon has not demonstrated the absence of a fact dispute, and the Employment Agreement is at least ambiguous as to whether Kahlon could, in any circumstances, enter into a Related Party Agreement without authorization from the Board. *See Celotex*, 477 U.S. at 322–23 (the moving party bears the initial burden to show the absence of a dispute); *Topps*, 526 F.3d at 68 (summary judgment is generally inappropriate in a contract dispute unless the contract is wholly unambiguous); Employment Agreement § 3.2.3 (stating that the CEO's authority to enter into contracts without Board authorization, once the Board has approved an annual budget, does not extend to a Related Party Agreement). Kahlon has similarly failed to meet his initial burden with respect to other allegations in the AAC. Accordingly, the Court denies Kahlon's motion for summary judgment on Project Verte's counterclaim.

### G. Sealing Is Not Warranted.

Project Verte asks the Court to maintain under seal two sets of email exchanges between Jane Gol and Randy Tucker, the former CEO of Geodis America [ECF Nos. 77 ("Sealing Mot."), 78, 79]. The emails were submitted to the Court in connection with the motion for summary judgment on Project Verte's counterclaim that Kahlon breached the Employment Agreement in part by causing Geodis to sue Project Verte. Project Verte argues that the emails "contain

confidential settlement communications," and "the Second Circuit strongly endorses the confidentiality" of settlement documents. Sealing Mot. at 1, 2 (quoting *Schoeps v. Museum of Mod. Art*, 603 F. Supp. 2d 673, 676 (S.D.N.Y. 2009)). This argument fails because the emails do not contain settlement communications. According to Project Verte, Geodis filed a lawsuit against Project Verte on "November 7, 2019." AAC ¶ 12. The emails that Project Verte seeks to seal, however, are from September 2019, which was before any lawsuit was filed. Based on the Court's own review, the emails reflect business negotiations, not settlement discussions, and they do not contain sensitive information that outweighs the "strong presumption of access" to judicial documents. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 121 (2d Cir. 2006). The motion to seal the email exchanges is denied.

## IV.   CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment [ECF No. 80] is DENIED with respect to Plaintiff's claim for breach of the Employment Agreement and GRANTED with respect to all other claims. Plaintiff's motion for summary judgment on Defendant's counterclaim [ECF No. 86] is DENIED. Defendant's motion to seal [ECF Nos. 77, 78, 79] is DENIED. The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 77, 78, 79, 80, and 86.

**SO ORDERED.**

**Date:  March 23, 2022**          **MARY KAY VYSKOCIL**
**New York, NY**                  **United States District Judge**